# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Colin Marshall, et al., | Case No.: 2:18-cv-00078-JAD-CWH |
| Plaintiffs | **Order Denying Without Prejudice Motions to Compel Arbitration and to Dismiss** |
| v. | [ECF Nos. 8, 12] |
| Christopher Gregory Rogers, et al., | |
| Defendants | |

Plaintiffs Colin Marshall, Caroline Ventola, Chris Cheng, Daniel Dykes, and Winston Cheng (Winston) allege in this removed case that Winston used Airbnb to rent a house in unincorporated Clark County, Nevada, from Christopher Gregory Rogers for all of the plaintiffs to stay in for six days in January 2016.[1] But when plaintiffs discovered video cameras hidden throughout the house, including in private areas like bedrooms and bathrooms, they called law enforcement and stayed elsewhere. Plaintiffs say they later learned that Rogers is a convicted felon, and that transient rental of his home is prohibited by the Clark County Code. So, plaintiffs sue a handful of defendants who they contend own, manage, or benefit from the rental of that home (the Rogers defendants), and they sue Airbnb, Inc. in tort and fraud, under NRS Chapter 598 for deceptive trade practices, and for declaratory and injunctive relief. They generally allege that Airbnb is obligated to keep a tighter control over whom it allows to rent properties on the Airbnb website, and to do the same for the properties, too.

---

[1] ECF No. 1-2 (first-amended complaint).

Airbnb now moves to compel plaintiffs to arbitrate their claims against it, and to stay this case pending arbitration.[2] It argues that each plaintiff agreed to Airbnb's terms of service (TOS)—which contains an agreement to arbitrate—or is bound by the principles of agency and estoppel to Winston's agreement. Airbnb also argues that the parties clearly and unmistakably agreed to delegate questions about the scope of the arbitration clause to the arbitrator. Plaintiffs respond that the TOS is a contract of adhesion, and they dispute whether a valid arbitration agreement exists between Airbnb and any of them.[3]

I find that Airbnb has demonstrated that each plaintiff signed up for a user account with Airbnb and agreed to at least one version of the TOS. But Airbnb has not demonstrated that Dykes or Winston agreed to arbitrate when they each agreed to the third and fourth versions of the TOS, or when Dykes agreed to the sixth version of the TOS. I also find that Airbnb has not shown that the parties clearly and unmistakably delegated questions about the arbitration clause's scope to the arbitrator. Because key questions of law and possibly fact still surround that issue, I deny Airbnb's motion to compel arbitration without prejudice.

Airbnb also moves to dismiss the claims against it.[4] I anticipate that my decision on whether plaintiffs must be compelled to arbitrate will impact Airbnb's dismissal arguments, so, to ensure a clear record in this case, I deny Airbnb's motion to dismiss without prejudice to its ability to reurge that motion, too, if necessary, after the court determines whether the plaintiffs must be compelled to arbitrate their underlying dispute with Airbnb.

---

[2] ECF No. 8.
[3] ECF No. 26.
[4] ECF No. 12.

**Discussion**

**A.     Standard for compelling arbitration under the FAA**

The Federal Arbitration Act (FAA) states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy" arising out of the contract or transaction "shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract."[5]  The FAA permits any party who is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition any federal district court for an order compelling arbitration in the manner provided for in the arbitration agreement.[6]

"By its terms, the [FAA] 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'"[7]  "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."[8]  The party seeking to compel arbitration has the burden to show that both of these questions must be answered in the affirmative.[9]  "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."[10]

---

[5] 9 U.S.C. § 2.

[6] *Id.* at § 4.

[7] *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

[8] *Id.* (collecting authorities).

[9] *Nguyen v. Barnes and Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

[10] *Chiron Corp.*, 207 F.3d at 1130.

**B.     Do valid agreements to arbitrate exist between Airbnb and each plaintiff?**

   *1.     Legal standard*

"The Supreme Court has emphasized that the 'first principle' of its arbitration decisions is that '[a]rbitration is strictly a matter of consent and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'"[11]  "When determining whether parties have agreed to submit to arbitration," federal courts "apply general state-law principles of contract interpretation, while giving due regard to federal policy in favor of arbitration by resolving ambiguities as to scope of the arbitration in favor of arbitration."[12]  But federal courts "do not apply the so called 'presumption in favor of arbitrability' in every case."[13]  "Where the arbitrability of a dispute is contested, we must decide whether the parties are contesting the *existence* or *scope* of an arbitration agreement.  If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply."[14]

Federal courts decide which state's law to apply by "using the choice-of-law rules of the forum state, which in this case is" Nevada.[15]  "Nevada tends to follow the Restatement (Second) Conflict of Laws (1971) in determining choice-of-law questions involving contracts . . . ."[16]  "So long as 'the parties acted in good faith and not to evade the law of the real situs of the contract,' Nevada's choice-of-law principles permit parties 'within broad limits to choose the law that will

---

[11] *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741–42 (9th Cir. 2014) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)).

[12] *Id.* at 742 (internal quotation marks and quoted references omitted).

[13] *Id.*

[14] *Id.*

[15] *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (brackets and internal quotation marks and quoted references omitted).

[16] *Progressive Gulf Ins. Co. v. Faehnrich*, 327 P.3d 1061, 1063–64 (Nev. 2014).

4

determine the validity and effect of their contract.'"[17] "'The situs fixed by the agreement, however, must have a substantial relation with the transaction, and the agreement must not be contrary to the public policy of the forum,' or other interested state."[18]

### *2. Airbnb's evidence*

To show that a valid arbitration agreement exists between it and each plaintiff, Airbnb provides the declaration of product manager Kyle Miller along with documents that Miller declares are true and correct records kept in the ordinary course of business.[19] Miller is familiar with "the computer code that generates the platform and website pages maintained by Airbnb, including . . . the parts of the code that display Airbnb's sign-up screens and subsequent events that require user assent or consent on both computer and mobile devices."[20] Miller is also "familiar with the manner in which Airbnb maintains its records of user assent and account creation in the ordinary course of its business," among other things.[21]

Miller explains that Airbnb "provides an online platform that connects third-parties who wish to offer their unique accommodations"—called "Hosts"—"with third-party travelers seeking to book accommodations"—called "Guests."[22] The platform can be accessed through computers and on mobile devices.[23] The code determines "the user interface presentation" and

---

[17] *Id.* at 1064 (quoting *Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortgage Investors*, 603 P.2d 270, 273 (Nev. 1979)).

[18] *Id.* (quoting *Ferdie Sievers*, 603 P.2d at 273).

[19] ECF Nos. 9 (Miller declaration), 10-1–10-25 (business records).

[20] ECF No. 9 at 1–2, ¶ 1.

[21] *Id.* at 2, ¶ 1.

[22] *Id.* at 2, ¶ 2.

[23] *Id.*

5

how the platform behaves.[24] It also "controls the format of the screens presented to users when they assent to Airbnb's Terms of Service" and "causes the dates and times of users' assent to each version of the Terms of Service to be recorded in Airbnb's database in the ordinary course of business at or near the time of the assent."[25]

Miller declares that, after August 15, 2011, users were informed that, by signing up for an Airbnb account, they were agreeing to the TOS, which was hyperlinked in the sign-up screen so users could click and read the full document before committing, which they would do by clicking the "sign up" button.[26] According to Miller, "after August 15, 2011, no Airbnb user could create an Airbnb account, list or book an accommodation via the Airbnb platform, or send messages via the Airbnb platform without first creating an account and agreeing to the then-current Terms of Service . . . ."[27]

Miller explains and provides examples of the various screens that existing account holders have been presented with over the years whenever Airbnb modified the TOS.[28] The screens contain: (1) a notice summarizing the changes made to the TOS; (2) a scrollable copy of the modified TOS; (3) a box that the account holder had to check, which was under the text of the modified TOS and next to the statement "I agree to the Terms of Service . . . ."; and (4) two click buttons located under the check box, one that allows the account holder to "Disagree" and log out and the other to "Agree."[29]

---

[24] *Id.* at 3, ¶ 4.
[25] *Id.*
[26] *Id.* at 3–5, ¶¶ 6–10.
[27] *Id.* at 3, ¶ 5.
[28] *Id.* at 9, ¶ 19; ECF Nos. 10-14–10-18.
[29] ECF No. 9 at 9, ¶ 19; *see also* ECF Nos. 10-14–10-18.

6

Miller declares that he personally reviewed Airbnb's business records pertaining to the plaintiffs' user accounts and confirms that each of them signed up for an account and agreed to Airbnb's TOS on at least one occasion.[30] According to Miller, Airbnb's records show that:

- Daniel Dykes signed up for a user account on December 18, 2010; agreed to the first version of the TOS on August 9, 2012; agreed to the third version of the TOS on May 5, 2014; agreed to the fourth version of the TOS on August 6, 2015; and agreed to the sixth version of the TOS on November 23, 2016.[31]

- Winston Cheng signed up for a user account and agreed to the second version of the TOS on June 12, 2013; agreed to the third version of the TOS on May 5, 2014; and agreed to the fourth version of the TOS on August 7, 2015.[32]

- Colin Marshall signed up for a user account and agreed to the fourth version of the TOS on October 21, 2015.[33]

- Caroline Ventola signed up for a user account and agreed to the fourth version of the TOS on November 25, 2015.[34]

- And Chris Cheng signed up for a user account and agreed to the fourth version of the TOS on December 10, 2015; and agreed to the fifth version of the TOS on June 30, 2016.[35]

---

[30] ECF No. 9 at 3, ¶ 4.
[31] *Id.* at 3, 7–8, ¶¶ 5, 16; *see also* ECF No. 10-9.
[32] ECF No. 9 at 5–6, ¶ 12; *see also* ECF No. 10-9.
[33] ECF No. 9 at 6–7, ¶ 14; *see also* ECF No. 10-9.
[34] ECF No. 9 at 7, ¶ 15; *see also* ECF No. 10-9.
[35] ECF No. 9 at 6, ¶ 13; *see also* ECF No. 10-9.

Each version of the TOS states that it will be interpreted "in accordance with the laws of the State of California and the United States of America, without regard to its conflict-of-law provisions."[36] Each version also states that "these Terms supersede and replace any and all prior oral or written understandings between Airbnb and you regarding bookings or listing of Accommodations, the Site, Application, Services, Collective Content and Referral Program."[37] Finally, and immaterial differences aside, the "Dispute Resolution" section in each version of the TOS states that the FAA governs the agreement's interpretation and enforcement and that:

> You and Airbnb agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation, or validity thereof, or to the use of the Services or use of the Site or Application (collectively, "***Disputes***") will be settled by binding arbitration . . . .
>
> The arbitration will be administered by the American Arbitration Association ("AAA") in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the "AAA Rules") then in effect, except as modified by this "Dispute Resolution" section.[38]

### 3. *Plaintiffs contest the existence of an arbitration agreement*

Plaintiffs argue that Airbnb has not demonstrated that any of them are the users who Miller says created user accounts with Airbnb and agreed to at least one version of its TOS. But plaintiffs do not provide any evidence to show that they did not sign up for accounts with Airbnb. Nor do they provide evidence to show that they did not agree to the versions of the TOS

---

[36] ECF No. 10-20 at 19 (version 1); *accord* ECF No. 10-21 at 24 (version 2); ECF No. 10-22 at 26 (version 3); ECF No. 10-23 at 35 (version 4); ECF No. 10-24 at 32 (version 5); ECF No. 10-25 at 22 (version 6).

[37] ECF No. 10-20 at 18 (version 1); *accord* ECF No. 10-21 at 24 (version 2); ECF No. 10-22 at 25 (version 3); ECF No. 10-23 at 33 (version 4); ECF No. 10-24 at 31 (version 5); ECF No. 10-25 at 21 (version 6).

[38] ECF No. 10-20 at 19 (version 1); *accord* ECF Nos. 10-21 at 25 (version 2); 10-22 at 26 (version 3); 10-23 at 34 (version 4); 10-24 at 67 (version 5); 10-25 at 22 (version 6).

8

that Miller says they agreed to. The only evidence plaintiffs provide on this topic is an unauthenticated and heavily redacted email purportedly from Airbnb notifying Ventola that Airbnb is updating the TOS, which was sent over a year and a half before the time that Miller says Ventola created a user account and agreed to the fourth version of the TOS.[39] I find that plaintiffs have failed to raise a genuine dispute about whether each of them signed up for a user account with Airbnb or whether each of them agreed to at least one version of the TOS.

Plaintiffs do, however, raise a contract-formation dispute that concerns Dykes and Winston. Plaintiffs argue that no arbitration agreement exists with those plaintiffs because neither of them resides in the United States and, starting with the third version of the TOS, the arbitration agreement applies only to users who reside in the United States.[40] The third version of the TOS opens by stating that, "[i]f you are using the Site, Application or Services and you reside in the USA, you are contracting with Airbnb, Inc. If you reside outside of the USA, you are contracting with Airbnb Ireland."[41] It then explains that, [i]f you initially reside in the USA and contract with Airbnb, Inc., but subsequently change your residence to outside of the USA, you will contract with Airbnb Ireland from the date on which your place of residence changes, and vice versa."[42] Another section, entitled "additional clauses for users contracting with Airbnb Ireland[,]"[43] states that "[t]he **Dispute Resolution** clause shall be removed and is not

---

[39] ECF No. 26-3.

[40] Plaintiffs do not articulate why the changes made to the arbitration agreement that began with the third version of the TOS affect whether an agreement to arbitrate was formed between Airbnb and Dykes or Winston under the prior-versions of the TOS that they agreed to.

[41] ECF No. 10-22 at 2.

[42] ECF No. 10-22 at 2.

[43] *Id.* at 27 (emphasis omitted).

9

applicable."[44] The fourth version of the TOS, which Dykes and Winston both agreed to, and the sixth version, to which Dykes also agreed, provide much the same.[45]

Dykes declares that he is a British citizen who resides in Great Britain and has for the past six years, and that he resided in Australia before that.[46] Dykes has "never resided in the United States."[47] Airbnb does not dispute that Dykes has never resided in the United States, but it argues that he is bound under the principles of agency and estoppel to Winston's agreement to the TOS. Winston, however, declares that although he is U.S. citizen, he has resided in Shenzhen, China, since January 2013.[48] He has held residence permits and alien-employment permits from China since January 2013, and his current permits expire in January 2019.[49] Winston has rented an apartment in Schenzhen, China, since November 2013, and has not paid for housing in the United States since that time.[50] Winston explains that he sometimes uses his parents' home in El Cerrito, California, as a U.S. mailing address, but he does not reside at that address and has not since January 2013.[51]

Airbnb argues that I should estop Winston from denying that he resides in the United States, and it points to the Rogers-Cheng rental agreement and documents that Winston filed with the California Secretary of State about his company, Aeon Labs, LLC, which Airbnb claims

---

[44] *Id.*

[45] *See* ECF No. 10-23 at 2, 33–36 (version 4); ECF No. 10-25 at 2, 21–24 (version 6, which has a similar carve out for users who reside in China and are, thus, deemed to be contracting with Airbnb Internet (Beijing) Co., Ltd.).

[46] ECF No. 26-4 at 2, ¶¶ 2, 4–5.

[47] *Id.* at 2, ¶ 6.

[48] ECF No. 26-6 at 2, ¶¶ 2–3, 6.

[49] *Id.* at 2, ¶¶ 4–5.

[50] *Id.* at ¶ 6.

[51] *Id.* at 3, ¶ 8.

10

show that Winston has held himself out as residing in California. But Airbnb has not demonstrated how it relied to its detriment on Winston's alleged conduct, which is a necessary element of the doctrine of equitable estoppel,[52] so I decline to do so.

Airbnb also argues that Winston's Chinese residence is not relevant because "it is black letter law that while individuals can have only one domicile, they can have more than one residence."[53] Airbnb relies on cases that consider the meaning of residence in the context of determining adequacy of service,[54] domicile for the purposes of subject-matter jurisdiction,[55] and residence for tax-filing purposes.[56] But Airbnb does not explain why these cases apply in this context, which is a matter of contract interpretation. Indeed, which Airbnb entity Dykes and Winston are deemed to have contracted with and, thus, whether the dispute resolution section of the TOS applies to either of them, depends on what the parties meant when they said that:

> If you are using the Site, Application or Services and you reside in the USA, you are contracting with Airbnb, Inc. If you reside outside of the USA, you are contracting with Airbnb Ireland. If you initially reside in the USA and contract with Airbnb, Inc., but subsequently change your residence to outside of the USA, you will contract with Airbnb Ireland from the date on which your place of residence changes, and vice versa.[57]

---

[52] Neither side argues which state's law I should apply in deciding whether a valid arbitration agreement exists between Airbnb and each of the plaintiffs. I note that the elements of the doctrine of equitable estoppel are the same under California and Nevada law. *Compare Gaines v. Fidelity Nat. Title Ins. Co.*, 365 P.3d 904, 916 (Cal. 2016) *with Cheqer, Inc. v. Painters and Decorators Joint Committee, Inc.*, 655 P.2d 996, 998–99 (Nev. 1982).

[53] ECF No. 45 at 4.

[54] *Id.* (citing *Jaffe and Asher v. Van Brunt*, 158 F.R.D. 278 (S.D.N.Y. 2002), and *Craigslist, Inc. v. Hubert*, 278 F.R.D. 510 (N.D. Cal. 2011)).

[55] *Id.* (citing *Ceglia v. Zuckerberg*, 772 F.Supp.2d 453 (W.D.N.Y. 2011)).

[56] *Id.* (citing *Vento v. Director of Virgin Islands Bureau of Internal Revenue*, 715 F.3d 455 (3d Cir. 2013)).

[57] *See* ECF No. 10-22 at 2 (version 3).

11

It also depends on how that interpretation applies to the facts in this case. But neither side has analyzed how the TOS should be interpreted, let alone which state's law governs that analysis.

Plaintiffs briefly argue that each version of the TOS is invalid because it is a contract of adhesion under Nevada law.[58] I do not address this argument because the Supreme Court's precedent is clear that, when a party argues that the whole contract is invalid, not merely the agreement to arbitrate, validity must be decided by the arbitrator in the first instance.[59]

Based on this record, I find that Airbnb has demonstrated that a valid agreement to arbitrate exists between it and: (1) Daniel Dykes, which is contained in the first version of the TOS; (2) Winston Cheng, which is contained in the second version of the TOS; (3) Colin Marshall, which is contained in the fourth version of the TOS; (4) Caroline Ventola, which is contained in the fourth version of the TOS; and (5) Chris Cheng, which is contained in the fourth and fifth versions of the TOS. But I find that Airbnb has not demonstrated that Daniel Dykes or Winston Cheng agreed to arbitrate when they agreed to the third and fourth versions of the TOS or when Daniel Dykes agreed to the sixth version.

**C.    Did the parties delegate questions of arbitrability to the arbitrator?**

"The question of whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"[60] "[T]he phrase "question of arbitrability" has a . . . limited scope."[61] It applies "in the kind of narrow circumstance where contracting parties

---

[58] *See* ECF No. 26 at 8.

[59] *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010) (collecting cases).

[60] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT & T Tech., Inc. v. Comm. Workers*, 475 U.S. 643, 649 (1986)).

[61] *Id.*

12

would likely have expected a court to have decided the gateway matter . . . ."[62] Whether the underlying dispute falls within the scope of the arbitration agreement is a question of arbitrability.[63] So, to avoid judicial determination of that question, the parties must have "clearly and unmistakably" delegated it to the arbitrator.

Airbnb argues that the parties clearly and unmistakably delegated questions about the scope of the arbitration agreements to the arbitrator, and it points to the dispute-resolution section in each version of the TOS. The dispute-resolution section states that "You and Airbnb agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation, or validity thereof," will be decided by binding arbitration.[64] "Terms" means the entire contract, the terms of service.[65]

Airbnb says that this language is similar to what the Ninth Circuit found in *Momot v. Mastro*[66] and *Mohamed v. Uber Technologies, Inc.*[67] to clearly and unmistakably delegate questions of arbitrability to the arbitrator. The arbitration clause in *Momot* states that, "[i]f a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement, or the validity or application of any of the provision of this Section 4" it "shall be resolved exclusively by binding arbitration."[68] "Section 4" of the

---

[62] *Id.* at 83–84.

[63] *See id.* at 84 (citing *AT & T Tech., Inc.*, 475 U.S. at 651–52; *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241–43 (1962)).

[64] *See, e.g.,* ECF No. 10-20 at 19.

[65] *See, e.g.,* ECF No. 10-20 at 2 (labeling "these Terms of Service as the "Terms").

[66] *Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011).

[67] *Mohamed v. Uber Tech., Inc.*, 848 F.3d 1201 (9th Cir. 2016).

[68] *Momot*, 652 F.3d at 984.

13

*Momot* agreement concerns only the "Resolution of Disputes."[69] The arbitration clause in *Mohamed* provides that disputes are to be resolved by an arbitrator and "disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision."[70] The language in both cases specifically delegated questions about the arbitration clause to the arbitrator.

But the language used in the dispute-resolution section of the TOS does not delegate questions about that section itself to the arbitrator. In fact, the language that Airbnb calls a "delegation clause" is just a generic agreement to arbitrate disputes about the TOS contract as a whole,[71] not "an additional, antecedent agreement" "concerning the arbitration agreement" itself.[72] Thus, the language in the TOS is materially distinguishable from the language in *Momot* and *Mohamed*, and I do not find that it clearly and unmistakably delegates questions about the scope of the arbitration agreement to the arbitrator.

Airbnb also points out that the arbitration agreement incorporates the AAA's Commercial Arbitration Rules, which give the arbitrator authority to rule on his or her own jurisdiction, including "any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."[73] The Ninth Circuit has twice

---

[69] *Id.* (emphasis omitted).

[70] *Mohamed*, 848 F.3d at 1208.

[71] *See, e.g.,* ECF No. 10-20 at 19 ("any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services of use of the Site or Application (collectively, "***Disputes***") will be settled by binding arbitration").

[72] *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010).

[73] ECF No. 8 at 21 n.7 (quoting AAA Commercial Arbitration Rule 7).

14

found similar or identical incorporation language sufficient to clearly and unmistakably delegate questions of arbitrability to the arbitrator.[74] But the holdings of those cases are limited to their facts: the contracting parties were all sophisticated and neither case concerned a consumer contract.[75] Airbnb does not mention those cases in its motion, let alone analyze why I should extend those holdings to the consumer contracts and parties that are before me. Airbnb's footnoted statement about the AAA's rules "hardly qualifies as 'discussion[,]'"[76] and I decline to engage in this analysis sua sponte. I therefore find that Airbnb has not demonstrated that the parties clearly and unmistakably delegated questions about the scope of the arbitration agreements to the arbitrator.

The upshot of this order is this: I find that valid agreements to arbitrate exist between Airbnb and each plaintiff. But questions of law and possibly fact remain about whether Daniel Dykes or Winston Cheng agreed to arbitrate when they agreed to the third and fourth versions of the TOS and Daniel Dykes agreed to the sixth version. Questions of law and possibly fact also remain about whether the parties agreed to delegate questions about the scope of the arbitration agreements to the arbitrator. Both of these issues are material to whether I must compel each of the plaintiffs to arbitrate their claims. And whether I decide to do that will likely impact Airbnb's arguments that all claims against it should be dismissed.

---

[74] *See, e.g., Oracle America, Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074–75 (9th Cir. 2014); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015).

[75] *Oracle America, Inc.*, 724 F.3d 1074–75; *Brennan*, 796 F.3d 1130–31.

[76] *See CIGNA Corp. v. Amara*, 563 U.S. 421, 477 n.1 (2011) (Scalia, J., concurring in judgment).

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Airbnb's motion to compel arbitration **[ECF No. 8] is DENIED without prejudice** to its ability to reurge that motion, supplying the information and arguments that I have found deficient here.

IT IS FURTHER ORDERED that Airbnb's motion to dismiss **[ECF No. 12] is DENIED without prejudice** to Airbnb's ability to reurge it, if necessary, after the court determines whether any of the plaintiffs must be compelled to arbitrate their underlying dispute with Airbnb.

Dated: May 24, 2018

_____
U.S. District Judge Jennifer A. Dorsey